Good morning, Your Honors. May it please the Court, my name is Mary Ann Dugan, Counsel for the Appellants in this case. I know the Court has asked the parties to address a specific question so I will turn to that question first. The Court asked the parties to address whether the cumulative impacts claim is moot because the Meteor Timber Sale Environmental Impact Statement addressed the cumulative impacts of both the Meteor and the Knob Sales, the Knob Sale being the one that's on appeal here. And the Court cited Idaho's Boarding Congress v. Thomas. Your Honors, I re-reviewed that case yesterday and one thing that jumps out is that in that case there were two environmental assessments. The environmental assessment that was being challenged and then another environmental assessment for another sale. And what the Court said was that you, the agency does not necessarily have to address the cumulative impacts of two sales in both EAs. But what the Court looked at was the fact that the EA in the other sale that was not being challenged, because it ended up being an EA and not an EIS, by definition, the agency found that the two sales together would not have a cumulatively significant impact. The Court did note that the that did not answer the question of whether the cumulative impact analysis in the second EA was adequate, but that could be addressed later on remand after a new document was prepared, because the Court sent it back for a full EIS for other reasons. View that as it may, the big difference here is that in the Meteor timber sale, which is not being challenged in this Court, they came to the conclusion that the two sales together, combined with other projects, did have a significant impact. For Meteor, they prepared a full environmental impact statement, thereby finding that there was significant, there was going to be significant impact. Help me with this. It seems to me you make, among others, two arguments in this case. One is that there should have been a full-blown EIS and not just an EA. Is that correct? Correct, Your Honors. And second, you argue that the EA failed to take into consideration the Meteor sale, right? Correct, Your Honor. And I would say the second issue... Why doesn't a full-blown EIS done later on both sales wipe out those arguments? Because what is happening in the instant case is the exact opposite of what happened in ISC v. Thomas. Here, and just to lay out the timing, here the knob decision was written and issued prior to the Meteor EIS being prepared. The Meteor EIS states that when you take these sales together in these sub-watersheds, the impact is significant. Therefore, the knob EA is incorrect in finding that the impact of the knob sale when taken together with the Meteor EIS. Both things cannot be true. And as we've argued in the briefs, what is true is that there will be significant impacts. The knob decision, as I said, was issued before the Meteor EIS was prepared. So the Meteor EIS analysis could not in any way have informed the knob EA decision. And the Meteor EIS found that there would be significant impacts specifically because of impacts to these damaged watersheds. These are the same sub-watersheds that are affected by the knob sale. And it simply does not add up to say that knob plus proposed sales is not significant. Meteor plus proposed sales, including knob, is significant. They were talking about the same sub-watersheds, the same sales. And in the knob EA, the government explicitly excluded the Meteor sale from analysis. In other words, in issuing the EA, the government knew that Meteor was planned. It had to because it came out of the same parent sale, you might say, as knob, and yet excluded it, asserting that Meteor was in the initial planning stage and that the specifics of the units were not identified. That is not the test established in this Court. In this Court, any sale that is proposed has to be addressed in the cumulative impacts analysis. Now, didn't the agency address the Meteor sale in response to comments? Didn't that come up in the comment period? Yes, Your Honor, it did. And I believe that's what I was citing to you. Actually, I think in the EA itself, at ER 41, which I believe is the EA, they addressed but excluded discussion of Meteor. My reading is the agency's position was that at the time the EIA was finalized, Meteor hadn't progressed far enough along to warrant inclusion, A. And then, B, their position is that they addressed it in the comment period because people commenting on the EA brought up the Meteor sale or it came up during those discussions. What's your response to that? Well, the response is that, yes, at first they excluded it because of timing, and they said because the specifics of the units were not identified, which, as I said, is not the correct test. At ER 140, they said the Meteor timber sale has been proposed, and that is the test in this Court. That was a month before the NOB timber sale EA was issued. The second issue is if they're arguing that their analysis in response to comments fixes the problem, that is not adequate. This Court has made clear that the analysis has to be in the NEPA document itself, not in the response to comments. That comes too the impacts so that people can comment on them and so that the decision maker can take that into consideration. And the third issue of whether the Meteor EIS analysis is enough to cover to fix the problem with the NOB EA, no. Meteor EIS says you take NOB plus Meteor, you get significance in this watershed. Therefore, the NOB EA's conclusion, to the contrary, is wrong. If they had come out with an EA for Meteor, we would be in the ISC versus Thomas situation. As we made clear in our briefs, the major impact that this project will have, besides the basic impacts to damaged watersheds, is that it will severely impact the northern spotted owl habitat that exists in this watershed. There are levels, various levels of impact that can be described by the Forest Service and the Fish and Wildlife Service to threatened and endangered species. Very often the Forest Service will come out with a project and say to Fish and Wildlife, we do not believe this project is likely to impact the spotted owl. Here, the Forest Service said, we acknowledge that this project is likely to adversely impact the spotted owl. And the Fish and Wildlife Service agreed and said, yes, we think that it's anticipated that this project will destroy three nest sites. Therefore, the Fish and Wildlife Service went to the next step, which is to issue an incidental take permit, saying this project is likely to take three nests and destroy three nests. But it's not likely to push the species into extinction, which of course the Fish and Wildlife Service doesn't have the power to approve a project that would push a species into extinction. That would take the god squad, which is very rarely invoked. So we're in a situation where it's not just the critical habitat of the spotted owl is being logged, which is clear. It's not just the suitable habitat, which is the larger concept, is being logged. It's that three nest sites are actually going to be taken. And what NEPA says is if there will be any impact, excuse me, to a threatened or endangered species or its critical habitat, that is a factor that militates in favor of a full EIS. And when you look at the extent of the impacts to the northern spotted owl, it's clear that this project, just like the meteor project, warrants a full environmental impact statement. In the project that we have before us, if I understand correctly, the critical habitat affected is four one-hundredths of one percent of the entire critical habitat. Is that correct? Fourteen acres. No, Your Honor. The sale proposes logging 125 acres of northern spotted owl critical habitat. That's ER 44 to 45. And specifically, looking at the sub-watersheds that are going to be logged. As I understand, there's 14 acres of critical habitat and there will be degradation of some 51 acres. That's not correct. What is the amount of critical habitat that's going to be affected? How many acres? 125 acres of critical habitat is proposed to be logged. Where is that located? ER 44 to 45. 44 to 45. Yes. Six of the timber sale units fall within three portions of, within portions of three designated critical habitat units. That's at the same page. And the proposed logging would remove most, if not all, of the amount of, a small amount of existing nesting habitat within those units. That's ER 106 to 107. And as far as the percentage, I don't at my fingertips have the percentage of critical habitat. I think that statistic that you expressed must be related to the larger overall amount of critical habitat. The point is any impact to critical habitat, the CEQ regulations say that is a factor requiring a full EIS. I want to make clear, this is not an Endangered Species Act lawsuit. We are not saying that the government is violating the Endangered Species Act by logging critical habitat. What we are saying is merely that they have to disclose to the public and to the decision makers what they are doing in a full environmental impact statement. And they have to disclose that by doing this, they may be significantly impacting the environment. It's disingenuous for them to come out and say, we find there is no significant impact, no significant impact from removing three northern spotted owl nests and logging 125 acres of critical habitat. I'm looking at ER 44 and it seems to say what Judge Wallace first asked about, that right at the bottom where it says a total of 218 acres, and then it says this represents 0.17 percent of the total acres of NRF habitat in the CHUs based on the FSEIS baseline. Are we talking about apples and apples here? Well, obviously the percentage issue depends on how large of an area you are looking at. There's two measurements. They say it's either 0.17 or 0.15. I'm sorry, where are we? Right at the bottom of Federal Appellee's Supplemental Excerpt of Record. Oh, the SCR. Volume 1. Okay. I'm sorry. I was looking at the ER, page 44 to 45. Okay. That is talking about nesting, roosting, foraging habitat. One problem is that so many different designations are addressed here and it's very easy to get confused between the different designations. This is also talking about, I think there's confusion because I was talking about the Excerpt of Record at 44 to 45, but the Supplemental Excerpt of Record at 44 is talking about what happened between 1994 and 2000, what's already happened, and that the amount of nesting, roosting, foraging habitat that was already removed through the year 2000 was 0.17%, et cetera. So we're talking about two different issues here. This project will remove 125 acres of critical habitat within these critical habitat units. More specifically, turning to the issue of suitable habitat, which is a type of habitat, it's spotted owl habitat that is nesting and roosting habitat with high canopy closure. It's a certain type of very high quality habitat for the spotted owl. This sale will remove 2.6% of the suitable spotted owl habitat within these sub-watersheds. This sale by itself, without Meteor, without all these other sales that occurred through the year 2000. So looking at suitable habitat, which is a separate issue, there's going to be a net loss, an actual loss of 130 acres of that. I understand this is all very confusing, and I can give you the sites. Mainly it's SER 106, SER 103, and those are the main pages that talk about those statistics. I'm not arguing, Your Honor, that statistics themselves answer the question of whether this sale may have significant impacts. However, all these issues we've pointed to in our briefs at length add up to a picture of significant impact. I'd like to reserve the remaining time for rebuttal. Thank you. Again, thank you for your argument, counsel. We'll hear from the government at this time. May it please the Court, I'm Lisa Jones from the Department of Justice for the United States Forest Service. I can turn directly to the critical habitat or because of. Okay. It's not so that the pages cited from the supplemental excerpts are talking about the past. It's, in fact, Judge Wallace was correct. In the critical habitat units that occur in the matrix outside of the late successional reserves, 14 acres will be removed. The remaining 125 acres will be degraded. So the statistics that Judge Wallace cited are correct and are right there in the supplemental excerpts and in the environmental assessment. I just wanted to make that clear. And if I could just turn back to the mootness question for a moment. Number one, if the question that the Court asked us to address was one of Article III mootness, whether there's a case or controversy with respect to the environmental assessment for the Knob Project, we don't believe that that is an Article III mootness issue. However, in reading the Idaho Boarding Congress language, as a practical matter, that issue has been addressed. The question of is there a cumulative impact between the prescriptions on the Knob Project and the prescriptions for the Meteor Project, the Meteor EIS addresses those sales together. And the same forest service, the same forest supervisor, understands that there isn't a significant impact between the Meteor and the Knob sale. If we concluded that the agency had not acted in an arbitrary and capricious way by not including Meteor because of timing, and that the Meteor issue as it impacted Knob was adequately addressed in the comment period, would we need to reach mootness? I don't think you would need to reach mootness, but I think you could address it. Yes, no, I understand. But I think that my opponent has mischaracterized Idaho's Boarding Congress and the language there in some way. I mean, the purposes of NEPA are twofold, and this Court is well aware of those. It's to inform the public of the impacts of a project, including the cumulative impacts, and it's also to inform the decision maker. It's interesting to note the timing here. While we made very clear in our brief that at the time that the Knob decision was made, the Meteor decision was at a very embryonic stage, although it was listed in a schedule of proposed actions. It was not proposed within the meaning of NEPA. There are terms of art, and a proposal within the meaning of NEPA is a bit of a term of art. The listing that EPIC points to is a quarterly listing that the Forest Service does, which says we are planning a project called X in X watershed. That's what was out there. That's it at the time that the Forest Service issued the Knob decision. It wasn't even scoped, and the scoping means sending out a letter saying here's generally what we're going to do until approximately a month after the Knob finding of no significant impact and decision notice was signed. So there wasn't the kind of requisite specificity to enable the Forest Service to do a really meaningful analysis of where the units would be and cumulative impacts that could occur. The more meaningful analysis under NEPA occurred when the Meteor was in the draft environmental impact statement and through the final environmental impact statement could look at the Knob project, which had already been fully formed, and said would there be significance. Now EPIC argues that just because there was an environmental impact statement prepared, that that per se meant there were significant impacts, significant cumulative impacts between Knob and Meteor, and that's just not correct. Agencies prepare environmental impact statements for a number of different reasons. Sometimes it's just because there could be a large public controversy, and in fact they may not believe that the issues are significant, but they may go forward and prepare an environmental impact statement. The Meteor EIS is not before this Court. I'd be happy to provide the Court with a copy if it would like, but it misstates that environmental impact statement and its findings to imply that the Forest Service found that the Knob sale plus the Meteor sale led to significant impacts, particularly significant impacts on owls. That's absolutely not correct. And if the Court wants more on that, we'd be happy to provide the Court with the actual document. If we want it, we'll ask for it. Right, okay. Let me just play this out for a second. Assuming you did a full EIS here and you got down to that question of cumulative impacts of the two projects, what would you say in the EIS? You couldn't contradict what you said in the other EIS, would you? Would most likely the agency say, we've already considered this, see other EIS, or not? I'm not sure if it would incorporate that discussion by reference or if it would reiterate that discussion. However, what's interesting to note with respect to timing and whether the Forest Service is informed with respect to the Knob sale, the advertisement for the Knob sale has been pulled. This project has not gone forward. So, in fact, in the reality of this, the Klamath National Forest and this district, the analysis from the Meteor sale is before the decision maker, so any effort to go forward with Knob is done cognizant of the full environmental impact statement in Meteor. But the analysis would have been the same if the Forest Service had before it the specifics of the Meteor units, et cetera, at the time it prepared the environmental assessment. Let me put the question a different way because I was asking you to speculate and obviously you couldn't figure it out. What is the usual practice of the Forest Service? Because you have many timber sales within a particular forest. What is your practice on using environmental impact statements on one timber sale if you need one on a second one? How do you coordinate when you have sales or projects that are adjacent to each other? Well, again, it's usually a question of timing. Here, you know, if you look in the environmental impact statement, it discusses, for instance, the Glassop's sale, sales that were either ongoing or in the near past, and looks at those units, et cetera, and tries to determine whether the incremental impact of the project at issue would be such that it would perhaps reach a threshold of significance. And an agency can prepare an environmental impact statement to make that determination. And here, the Forest Service did what it could with what it knew about Meteor at the time. I mean, it said it's out there. We just don't know where the prescriptions are. We wouldn't be able to meaningfully provide an analysis of Meteor plus Knob. But it has done that now. So I think given the timing of the sales, the fact that the sale isn't even going forward yet, and the fact that all of this information is before the decision maker, it would seem to not serve NEPA's purposes to require the Forest Service to add this discussion to whatever environmental document it felt would be appropriate, even if this court sent it back on remand, which we don't believe is necessary, but we believe NEPA's purposes have been served with respect to the Meteor sale. Could I turn you to ask another question? Well, two questions, really. One, I was looking at the risk of predators. I don't see that that was raised in the district court. If that's true, does that mean it's waived on appeal? That's our position, Your Honor. Yes, you're talking about the barred owl issue, the potential for the barred owl or great horned owl to expand and prey upon the northern spotted owl. That was not raised in the district court, and this court has held that if you didn't raise it before the district court, you've waived it for purposes of appeal. The other issue deals with Gifford-Boucher, and I suppose if our decision has to take into account that case, you would distinguish that case. The Gifford-Boucher decision was a decision made under the Endangered Species Act. It was a challenge to biological opinions, and as my opponent has pointed out to the court, they're not bringing an Endangered Species Act challenge. And the question is different. The question is whether the Forest Service made a reasonable determination and supported that determination that there were no significant impacts on the owl and other issues of concern based on the NEPA regulations governing significance. So really the way you would distinguish the case is on the basis of the standard of observation or standard review. That is, there's a much more strict standard in Environmental Species Act cases, almost like a meat cleaver where the Environmental Protection Act has a more flexible approach. Is that it? The two standards are different, so you can have a different result? Is that your argument? The two standards are different. And also, although EPIC would have this court believe that the Forest Service pinned all of its determinations that there would be no significant impacts on the owl on the Fish and Wildlife Service's biological opinion, that's not so. The Forest Service made independent determinations, of course, took into account the fact that the Fish and Wildlife Service said that the amount of habitat impacted is so small that there would not be significant impacts on the owl, even though the habitat would be changed on the species. Yes. So, I mean, that's certainly relevant to the Forest Service. I mean, it might be arbitrary and capricious had the Forest Service not taken into account what the Fish and Wildlife Service said. But I think that had they not, in a different case, we would be here arguing totally the flip side of that question, which is you ignored the Fish and Wildlife Service, and that was wrong. But the Forest Service here… My question goes to your best argument of distinguishing the case. Distinguishing the case is this is a NEPA case, and the question before the court is different. It's whether the Forest Service supported its decision that there were no significant impacts on the spotted owl. The question in EPIC was whether the Fish and Wildlife Service's biological opinions, in fact, used the appropriate interpretation of Endangered Species Act requirements, whether the Fish and Wildlife Service's regulations appropriately interpreted Endangered Species Act requirements. And those biological opinions that were remanded and found to be invalid in that case, because they relied on an inappropriate interpretation, that's just a totally different issue here under a different statute. Let me turn to one other question, then. In the 14 acres of critical habitat, there are three nests, as I understand it. Well, I guess I'd like to try to explain this a little bit more. The argument by EPIC is a bit overstated. Let me finish my answer, because you may be answering a different question. Okay. You have to answer mine. Assuming there are three nests that are there and they have spotted owls, within the work of the Forest Service, was there any determination made of how that impact would be mitigated as to those three nests? Yes. When the argument is made that three nest sites will be taken, that overstates the record. The situation is there are certain areas that have not been surveyed, and the Forest Service assumes, and the Fish and Wildlife Service assumed as well, that based upon the fact that there is some suitable nesting habitat and suitable foraging habitat and other things that owls tend to like, that owls might be roosting in these areas, even though there were no known nest sites. Nobody counted. They're not positive that there are owls there. They're not sure that there are not owls there. But what the project is designed in order – the project is designed so that there are seasonal restrictions, number one, so that there cannot be any activities during the time that the owls would be nesting, breeding, nesting, and during the fledgling period. So there would not be any activities while the owls would actually be using that nest. So the mitigation is that during the time, if there are nests, and if they are there, there would be no activity that would interfere with the procreation. Right, exactly. Or the Forest Service can go out and actually do protocol surveys, and if they find a nest, then they can't – then the seasonal restrictions would kick in because it's a known nest site. If they go out there and do three surveys and there are no owls out there, then the incidental take that the Fish and Wildlife Service allowed them is perhaps during those three surveys, this is a year that a breeding pair wasn't using what could be a nest tree, but maybe they used it five years ago or two years ago. Sometimes they move around. The Fish and Wildlife Service said, you can take that tree. That's the incidental take we're giving you under our incidental take statement. So there's this potential that you could take what might be a nest tree. It's not that there are trees out there that they know have spotted owls in them and they're going to take them. Okay, then the mitigation is something that is a continuing process, that is testing and surveying and observing? Yes, exactly. Okay. And in the known nest trees and known owl home ranges, there are 12 known home ranges and known nest trees. Those will not be taken. There will – no nest trees and no stands around those nest trees will be harvested, and that's at the supplemental excerpts of record at 47. And these seasonal restrictions apply to all of the units, not just to a portion but to all of them. Okay, that's helpful. Thank you. Let's see. I need to address something. There was also a statement that was made during the opening argument that there's a level of significance because the owl is likely to be adversely affected. Here the Forest Service found that habitat was likely to be adversely affected, not that the owl itself was likely to be adversely affected. And the project is designed in such a way, and we provided a map to the court in the pocket of our supplemental excerpts, and I would just ask that the court take a look at that because in addition to the Fish and Wildlife Service's findings that there was such a minuscule amount of habitat at issue and also the Fish and Wildlife Service and Forest Service worked together to ensure that there would be satisfactory elements, habitat components left in all of the critical habitat units, that there would be nest trees if owls wanted to come nest there, there would be sufficient foraging habitat available, there would be sufficient dispersal habitat there, that the diminishment would not be significant. It's important to also understand that these units that are very small and they're dispersed very widely throughout an 80,000-acre approximately watershed and throughout 10 sub-watersheds. There are a couple up here and there's one here and one down here. It's just if you look at that map, it's very indicative of the dispersal. It's also important within the context of determining significance under NEPA to examine the context of the project. And while the Forest Service certainly is not relying on the existence of late successional reserves that have been set aside under the Northwest Forest Plan, they're not relying on that, but they do note that, in fact, there are fully functioning late successional reserves that surround the project area. They buffer that side. There are also wilderness areas which are set aside under the Klamath National Forest Plan that are protected from harvest. So there are a number of different factors that are laid out in our brief in a number of different places, and we would respectfully request that the court affirm the district court because here the Forest Service, in its environmental assessment and in its findings of significant impact, identified all issues of concern and discussed in great detail why, in fact, there would not be significant impacts. Thank you. Thank you for your argument. Revato? Thank you, Your Honors. I think we need to get very clear about this issue of how much critical habitat is being locked. I'm honestly not sure where the 14-acre number is coming from. EA44 makes clear that within critical habitat unit CA25 South, 39 acres will be harvested within that critical habitat unit. Within CA25 North, 27 acres will be harvested. Within critical habitat unit CA22, 59 acres will be harvested. That's 125 acres logged within critical habitat. The degraded versus removed issue, which opposing counsel discussed, refers to the suitable habitat issue, and that's addressed in our briefs in detail. As far as the impacts to owl themselves, it's not just impacts to their habitat. The court must defer to the Fish and Wildlife Service's finding that the sale anticipates incidental take by harm of three northern spotted owl pairs. That is at SCR55, using their language. They don't just anticipate harm to the habitat. They anticipate harm to the owls. The fact that it won't be logged during breeding season doesn't mean that the owls then get to come back after the breeding season. Their nests will be gone. There are three historically confirmed NSO sites that will be logged. The surveys were done in the 1990s. The Fish and Wildlife Service and Forest Service did not resurvey, and have, in fact, declined a request for resurvey. And the Forest Service raises issues about uncertainty. The Fish and Wildlife Service noted, first of all, that northern spotted owl populations are declining at the rate of about 4% per year. That's at ER156. And went on to note that they lack information on the current NSO activity centers, and therefore could not, quote, accurately describe the likely impacts to the spotted owl from this project. That's ER161. The fact that there have not been recent surveys does not mean that they don't have to do a full environmental impact statement. The very opposite is true. As this Court stated in the National Parks case, to use uncertainty to find no significant impact turns NEPA on its head. Uncertainty is one of the factors, in addition to impacts to the owl, that requires FOLEIS. I see I'm out of time. If you have any questions, I'd be glad to answer them. I don't see any more. Thank you very much for your argument. Thank both sides for their argument. Very interesting case. The Court's going to stand in recess for about 10 minutes, and then we'll take up Vasek and the Gallo case.
judges: Wallace, Hawkins, Thomas